Laconia Family Division
No. 2009-751

IN THE MATTER OF MARTIN F. KUROWSKI AND BRENDA A. KUROWSKI

Argued: January 6, 2011
Opinion Issued: March 16, 2011

*Law Office of Joshua L. Gordon,* of Concord (*Joshua L. Gordon* on the brief and orally), for the petitioner.

*John Anthony Simmons, Sr.,* of Hampton, by brief and orally, for the respondent.

*Michael Donnelly,* of Purcellville, Virginia, on the brief, for the Home School Legal Defense Association, Christian Home Educators of New Hampshire, and Catholics United for Home Education, as *amici curiae.*

*Welts, White & Fontaine, P.C.,* of Nashua (*Lisa A. Biron* on the brief), for Cornerstone Policy Research, as *amicus curiae.*

LYNN, J. In recent years, home schooling has become a widely used alternative to more traditional public or private schools as the vehicle for educating children. Courts have neither the mandate nor the expertise to determine, from among these options, which generally provides the most

suitable education. When divorced parents are unable to agree on such educational choices for their minor children, however, courts are called upon to make these difficult and sensitive decisions, often in a highly contentious atmosphere — which may be all the more so if the parents' divergent views are affected by their individual religious beliefs. The case now before us is such a case.

The respondent, Brenda A. Kurowski (mother), appeals an order of the Laconia Family Division (*Sadler*, J.), recommended by the Marital Master (*Garner*, M.), granting the request of the petitioner, Martin F. Kurowski (father), to compel the enrollment of their minor daughter (daughter) in public school for the 2009-2010 school year.* Although mother challenges the trial court's order on broad grounds, including claims that it violates her constitutional parenting and religious rights, we affirm the decision on the narrow basis that it represents a sustainable exercise of the trial court's discretion to determine the educational placement that is in daughter's best interests.

The particular circumstances of this case bear emphasizing. The parties have had joint parenting responsibility for daughter at all times, including the joint authority to make decisions relating to her education. As two fit parents, they also have equal constitutional parenting rights. Yet, over the years, they have continually disagreed about whether daughter should be home-schooled or enrolled in public school. Because the parties could not reach a joint decision and father sought resolution in court, the trial court had to decide the dispute, guided by the best interests standard set forth in RSA 461-A:6, I (Supp. 2010). Our only role is to decide whether the trial court committed legal error or unsustainably exercised its discretion. While this case has religious overtones, it is not about religion. While it involves home schooling, it is not about the merits of home versus public schooling. This case is only about resolving a dispute between two parents, with equal constitutional parenting rights and joint decision-making responsibility, who have been unable to agree how to best educate daughter.

I

The facts are drawn from the record. The parties were divorced in 1999 in Massachusetts, at which time they stipulated to joint legal custody of

---

* Although the trial court's order governed placement of daughter for the 2009-2010 school year only, and that school year is now concluded, neither party has suggested that this case is moot. *See Batchelder v. Town of Plymouth Zoning Bd. of Adjustment*, 160 N.H. 253, 255 (2010). In any event, we note that the question of mootness is not subject to rigid rules, *id.* at 255-56, and conclude that a decision on the merits is justified because the case involves a matter which is capable of repetition yet evading review. *Appeal of Hinsdale Fed. of Teachers*, 133 N.H. 272, 276 (1990).

daughter who was an infant. At all times relevant to this appeal, daughter has resided primarily with mother. In 2002, the divorce decree was registered in New Hampshire after mother moved to this state with daughter. At the time of this move, daughter was about three years old.

In October 2002, the parties stipulated to a routine residential responsibility schedule that gave father time with daughter one evening per week and on alternate weekends from Friday evening until Sunday evening. They also agreed to "consult with one another with respect to the educational plans for said child." The subsequent post-divorce proceedings were protracted and we therefore mainly focus on the facts surrounding daughter's education.

Daughter attended a private school for kindergarten and mother decided to home school her for first grade. In 2005, father filed a contempt motion in which he alleged that mother had unilaterally decided to home school daughter. He also related his concern that daughter's home schooling was based upon mother's religious practice, which had the effect of isolating daughter from her peers. Father asked the trial court to require mother to consult with him with respect to educational plans and involve him in any decision-making. In her response, mother alleged, among other things, that the parties had had many conversations about the educational plans for daughter.

A hearing was conducted on father's contempt motion, at which both parties testified. Father testified that mother had failed to appropriately consult with him. In addition, he related his concern that daughter spent time exclusively with children who are part of her mother's church and religion, causing her to be uncomfortable in his family environment, and expressed his desire that daughter attend school outside mother's home to experience diversity and improve her ability to accept differences in his home. Mother testified to conversations the parties had had about daughter's schooling, described the nature of daughter's home school education that was based upon her religious convictions, and explained her objection to public schooling. At the conclusion of the hearing, the trial court complimented the parties on their parental devotion and encouraged them to continue to work cooperatively to address daughter's educational needs. In its April 2006 order, the trial court documented the parties' respective concerns, remarking that "[w]hen joint legal custody breaks down because the parties are unable to reach agreements, the Court's powers are limited." It noted, "The father is not requesting . . . that the Court resolve the parties' dispute by directing the mother to enroll the child in the public schools or in any other private school," and "The Court is reluctant to substitute itself as a decision maker and counsel has not asked the Court to

do so." Ultimately, the trial court denied father's contempt motion, rejecting his claim that mother had failed to consult with him on daughter's education.

In January 2007, father filed a motion for modification of parenting time, seeking to alter the parties' October 2002 partial stipulation. In the motion, father alleged: "At her mother's insistence, and against [his] wishes, [daughter] is home-schooled through a program that is affiliated with a church that both [mother] and [daughter] attend on a regular basis"; daughter is withdrawn during his parenting time and has difficulty integrating with his new wife and new child; mother's choices for daughter's education, religion and social environment are detrimental to daughter's welfare; and mother repeatedly interfered with his parental rights. According to father, daughter's therapist agreed that the father-daughter relationship suffered because she strongly identified with her mother and her mother's beliefs. He requested that the court appoint a guardian ad litem (GAL) to represent daughter's best interests and recommend changes to the parenting schedule, and issue a parenting plan describing the parties' parental rights and responsibilities. Mother objected, alleging that the therapist had noted daughter's "strong and loving relationship with both parties" and did not recommend a change in parenting time, and that father had failed to demonstrate that the current parenting schedule was detrimental to daughter's physical, mental or emotional health as required for modification under RSA 461-A:11 (Supp. 2010). In March 2007, the trial court appointed a GAL and, without making a finding as to the truth of his allegations, required father to "specifically identify the relief he seeks (so as to permit the Court to determine what legal standard should apply to the request)" and to "file a list of the specific Orders he requests."

Father submitted a proposed parenting plan in April 2007. In November 2007, before this plan was acted upon by the court, father filed motions to amend his proposed parenting plan and his pending motion for modification of parenting plan. He alleged that "it is in [daughter's] best interests to have equal parenting time," and he sought both to compel daughter's enrollment in public school and to expand his routine parenting time. Over mother's objection, the trial court granted his request to submit an amended proposed parenting plan and requested the GAL "to conduct her investigation with reference to that proposal and to [mother's] proposal for modification if any."

In September 2008, the GAL recommended that father be awarded expanded parenting time, that daughter not immediately transition fully into public school, and that daughter attend a traditional school beginning in the winter of her fifth grade year "unless jointly decided that she should continue with her home schooling program." Also in September, the parties

submitted proposed parenting plans and supplemental pleadings, illustrating their disagreement on daughter's school placement as well as on father's routine parenting time. Father sought to have daughter immediately enrolled in three public school classes, and enrolled in public school full time commencing in January 2010. Also, father sought an immediate increase in his parenting time to three consecutive weekends from Thursday afternoon through Monday afternoon "[u]ntil January 2010 or until such time as [daughter] matriculates to full time public school." Mother sought to continue daughter's home schooling "[s]o long as she continues to perform well academically and be enrolled in outside activities." Additionally, mother proposed a schedule of father's routine parenting time to include every other weekend and each Tuesday evening.

On September 24, 2008, the parties and the GAL agreed to a parenting plan, which was approved by the trial court in November 2008 (2008 Parenting Plan). Under the plan, the parties agreed to joint decision-making on all major decisions, including daughter's education and religious training. They also agreed to expand father's routine parenting time to alternating weekends from Thursday afternoon through Monday afternoon, and one week day evening in alternating weeks. With respect to daughter's schooling, the plan took into account that she was still receiving home schooling, and stated: "Irrespective of any other meetings the parents may hold, there shall be a meeting in January, 2010, when [daughter] is completing fifth grade, to discuss [daughter's] transition to public school, unless the parents agree she should continue home schooling at that time." In its order approving the 2008 Parenting Plan, the trial court stated that the parties had "agreed that the Court could schedule a one day hearing after June 1, 2009 on the issue whether the minor child should be enrolled in public school."

In January 2009, daughter began attending three classes at public school to augment her home school education. In February 2009, mother moved to modify the 2008 Parenting Plan alleging that daughter was experiencing "extreme difficulty" and that her "emotional and mental health have been negatively impacted by the increased time with [father]." In March, the GAL filed a motion reporting that daughter was experiencing some difficulty with the length of father's parenting time and that she needed help bonding with him. Without resolving mother's motion to modify, the trial court slightly reduced father's time for residential responsibility on a temporary basis so that daughter returned to her mother on Sunday evenings. The GAL subsequently recommended that father's routine parenting time resume. Further pleadings were filed by the parties, and a hearing was held on June 2, 2009, regarding pending motions, including the

school placement issue. At the hearing, mother, father and the GAL testified, and the parties submitted several exhibits.

On July 14, 2009, the trial court issued an order, finding that the parents "have had a long standing disagreement whether [daughter] should be home schooled, and that their level of communication makes it virtually impossible for them to reach an agreement about this issue," and ruling that daughter would attend public school in the 2009-2010 academic year. It denied mother's motion to modify the 2008 Parenting Plan to the extent that she was seeking a dramatic deviation from the existing orders, and ordered some changes to the parenting schedule pursuant to the parties' requests. Mother moved to reconsider the order and to stay that portion of the order requiring that daughter be enrolled in public school pending the outcome of an appeal. The trial court denied both motions, and this appeal followed.

When reviewing a trial court's decision on parenting rights and responsibilities, our role is limited to determining whether it clearly appears that the trial court engaged in an unsustainable exercise of discretion. *See In the Matter of Choy & Choy*, 154 N.H. 707, 713 (2007) (decided under former statute); *see also* RSA 461-A:2, I(d) (Supp. 2010) (stating that purposes of RSA chapter 461-A include "[g]rant[ing] . . . courts the widest discretion in developing a parenting plan"). We consider only "whether the record establishes an objective basis sufficient to sustain the discretionary judgment made," and we will not disturb the trial court's determination if it could reasonably have been made. *In the Matter of Choy & Choy*, 154 N.H. at 713 (quotations omitted).

The trial court's discretion necessarily extends to matters such as assigning weight to evidence and assessing the credibility and demeanor of witnesses. *See id.* Conflicts in the testimony, questions about the credibility of witnesses, and the weight assigned to testimony are matters for the trial court to resolve. *See id.* Indeed, resolution of the best interests of a child depends to a large extent upon the firsthand assessment of the credibility of witnesses, and the findings of the trial court are binding upon this court if supported by the evidence. *In the Matter of Hampers & Hampers*, 154 N.H. 275, 281 (2006). To the extent an appealing party argues that the trial court committed error involving questions of law, we review such issues *de novo. See In re Alex C.*, 161 N.H. 231, 235 (2010).

## II

Mother first argues that the trial court erred in utilizing the best interests standard to resolve the school placement issue without first finding that father proved one of the statutory circumstances necessary for modification of a parenting plan under RSA 461-A:11. This argument rests

upon her characterization of the trial court's decision as a ruling on "the petitioner's request to modify the parenting order." In its July 2009 order, the trial court approached the school placement issue as one in which the parties, who have joint decision-making authority concerning daughter, had never reached an agreement, and resolved the dispute by applying the bests interests standard. *See* RSA 461-A:4, :6 (Supp. 2010). When mother challenged the trial court's failure to apply RSA 461-A:11 in her motion for reconsideration, the trial court determined that that statute did not apply to the question of school placement. It reasoned, in part:

> Although the current [2008] Parenting Plan acknowledges that [daughter] was home schooled for the 2008-2009 school year, it does not require that she be home schooled in future years. The Plan requires the parties to meet in January 2010 to discuss the "transition to public school" for [daughter], and . . . it provides for alternatives for the February and April school vacations depending whether [daughter] is home schooled or is attending public school "in the future." Even assuming, therefore, that enrolling [daughter] in public school for the 2009-2010 academic year modifies the recent practice, it does not modify the existing Orders.

Mother argues that the trial court's school placement order did in fact modify "parental rights and responsibilities," *see* RSA 461-A:1, IV (Supp. 2010), which include the right to determine where one's child attends school. Therefore, she contends, the trial court "was bound to *first* consider whether any circumstances permitting modification under RSA 461-A:11 existed." We disagree.

■ Under RSA 461-A:11, "[t]he court may issue an order modifying a *permanent order* concerning parental rights and responsibilities under [certain statutorily enumerated] circumstances." RSA 461-A:11 (emphasis added). By its plain terms, RSA 461-A:11 governs requests to modify a *permanent order* concerning parental rights and responsibilities. RSA 461-A:11; *see In the Matter of Muchmore & Jaycox*, 159 N.H. 470, 473 (2009). Therefore, unless the trial court's ruling on school placement in this case modified a permanent order that decided or incorporated a parenting plan establishing parental rights and responsibilities relating to daughter's education, satisfying the standards of RSA 461-A:11 was not a prerequisite to the trial court's applying the best interests standard under RSA 461-A:6.

According to mother, the trial court's school placement ruling modified "the existing permanent orders, as contained in the September 2008 Parenting Plan." She also contends that in 2006, the trial court "determined that [daughter's] permanent status in home schooling would stand and that

if [father] wanted that to change the parents were to continue to work together." Mother argues that review of the procedural history of this case establishes that father petitioned the trial court to order the child to attend public school and that he bore the burden of proof under RSA 461-A:11 to secure his request. We are not persuaded.

The parties have had joint legal custody of daughter since their divorce, and in 2002, when daughter was three years old, they expressly agreed to consult one another about her education. In the context of father's 2005 motion for contempt, the parties disagreed about whether daughter should be home schooled. However, in denying the contempt motion, the trial court merely rejected father's allegation that mother had failed to consult with him on educational plans for daughter. It emphasized that it was not asked to resolve the school placement dispute or to direct mother to enroll daughter in public school or in any other private school. Although it remarked that the evidence before it would not have supported a request to compel a different school placement, and encouraged the parties to cooperate in deciding daughter's schooling, the trial court did not render a decision approving the home schooling or otherwise decide school placement of daughter.

Later, the parties agreed to the 2008 Parenting Plan, which retained the parents' joint decision-making authority for major decisions such as education, and established some expanded routine parenting time for father. With respect to schooling, the 2008 Parenting Plan (1) required daughter to attend school in the school district where mother, the parent with primary residential responsibility, resides, (2) created alternative schedules for February and April school vacations in the event daughter is home schooled or not "in the future," and (3) required the parents to meet in January 2010 "to discuss [daughter's] transition to public school, unless the parents agree she should continue home schooling at that time."

The 2008 Parenting Plan, agreed to by the parties and approved by the court, certainly constitutes an order that preserved their joint decision-making authority and governs the parties' routine residential responsibility. *See In the Matter of Muchmore & Jaycox*, 159 N.H. at 473 (parenting plan governing parenting time schedule was incorporated within the court decree); RSA 461-A:4 (parenting plan included within court judgment providing for parenting time with a child). However, it does not amount to a permanent court order on the school placement issue. At most, the plan required the parties to meet and discuss daughter's future schooling and established a vacation schedule depending on her school placement. In fact, in its order approving the 2008 Parenting Plan, the trial court expressly stated that the parties reserved the disputed issue of daughter's school

placement for resolution at a later date, and that it would decide the issue after a hearing that was expected to be scheduled in mid-2009. Therefore, prior to the trial court's school placement decision in 2009, there was no permanent court order concerning parental rights and responsibilities that governed whether daughter would be schooled at home or in another setting within the school district in which mother resides.

The parties reached an impasse regarding the exercise of their joint authority in relation to daughter's school placement, and the trial court faced a circumstance in which it had to resolve a parenting matter over which father and mother shared joint decision-making authority. In its 2009 ruling, the trial court did not modify the joint decision-making authority by, for example, granting one parent the authority to decide daughter's schooling. Indeed, in its order denying mother's motion for reconsideration, the trial court emphasized that the parties continued to have the joint authority to agree to daughter's school placement, and that it "would ratify their agreement."

We conclude that the trial court did not err in ruling that its 2009 school placement decision did not modify an existing permanent order concerning that subject matter. *See State v. Parker*, 155 N.H. 89, 91-92 (2007) (explaining that interpretation of a trial court order is a question of law which we review *de novo*). Accordingly, we reject mother's argument that the trial court erred by resolving the school placement issue under the best interests standard without first considering whether circumstances permitting modification under RSA 461-A:11 existed.

## III

Mother next argues that the trial court's decision requiring daughter to attend public school is subject to strict scrutiny because it infringes on the fundamental rights of parents to make decisions for the training and education of their children and undermines the fundamental rights of parents to direct their children's education in conjunction with the free exercise of religion. According to mother, the trial court's decision is erroneous because requiring daughter to attend public school is not justified by a compelling state interest and the trial court failed to consider a more narrowly tailored, less intrusive remedy. We consider her argument under only the United States Constitution because she does not specifically invoke a provision of the New Hampshire Constitution in her brief. *See State v. Dellorfano*, 128 N.H. 628, 632 (1986).

The United States Constitution protects the fundamental right of parents to make decisions concerning the custody, care and control of their children, including a child's education and religious upbringing. *See Troxel v. Granville*, 530 U.S. 57, 66 (2000) (plurality opinion) (parenting rights

protected under Due Process Clause of Fourteenth Amendment); *Wisconsin v. Yoder*, 406 U.S. 205, 213-14 (1972) (Free Exercise Clause of the First Amendment, and the traditional interest of parents, protect rights of parents to make decisions concerning the religious upbringing of their children); *Pierce v. Society of Sisters*, 268 U.S. 510, 534-35 (1925) (parents have liberty interest to direct the upbringing and education of children under their control); *see also In the Matter of Jeffrey G. & Janette P.*, 153 N.H. 200, 203 (2006). Both parents enjoy the fundamental liberty interest to direct the upbringing and education of their children, *see Jordan v. Rea*, 212 P.3d 919, 926 (Ariz. Ct. App. 2009), and there is a presumption that fit parents act in the best interests of their children, *Troxel*, 530 U.S. at 68.

Mother cites several cases in support of her contention that the trial court's school placement decision is subject to strict scrutiny. However, these cases are readily distinguishable from the case at bar; in none of the cited cases was a court resolving a dispute between two parents with equal constitutional parenting rights and decision-making authority regarding their child's education and religious training. *See, e.g., id.* at 60-61 (parent challenging court decision which granted grandparents visitation rights pursuant to statute); *Stanley v. Illinois*, 405 U.S. 645 (1972) (father challenging statutory presumption that unwed father was unfit to parent his child); *Peterson v. Minidoka County School Dist. No. 331*, 118 F.3d 1351 (9th Cir. 1997) (parents challenging state restrictions on the parental decision to home school); *People v. DeJonge*, 501 N.W.2d 127 (Mich. 1993) (same); *State v. Robert H.*, 118 N.H. 713 (1978) (parent challenging termination of parental rights), *overruled in part on other grounds by In re Craig T.*, 147 N.H. 739, 744-45 (2002).

Here, after they divorced, the parties agreed to share joint decision-making for major decisions concerning daughter, including her education. Each parent was equally entitled to the presumption that his or her respective decision was consonant with daughter's best interests. *See Troxel*, 530 U.S. at 68. Yet, each parent has chosen to exercise his or her respective constitutional rights and decision-making authority in a different manner, and they ultimately reached an impasse on the parenting decision of how to educate daughter. The legislature established a procedure for courts to resolve disputes between parents regarding parental rights and responsibilities. *See* RSA 461-A:4, :6, :11. Because the parties could not reach a joint decision and father sought resolution in court, the trial court was left to decide the dispute, guided by the best interests standard set forth in RSA 461-A:6, I. *See In the Matter of Jeffrey G. & Janette P.*, 153 N.H. at 203; *see also Morgan v. Morgan*, 964 So. 2d 24, 31 (Ala. Civ. App.

2007) (listing cases in which court applies best interests analysis to resolve schooling dispute between divorced parents sharing joint legal custody of their child).

We recognize that the best interests standard "does not and cannot abrogate a fit parent's constitutional right to direct the upbringing of his or her child." *Jordan*, 212 P.3d at 928. However, in the context of a divorce, the trial court has the authority to adjudicate disputes between two fit parents involving parental rights in accordance with the child's best interests. *See* RSA 461-A:4, :6; *In the Matter of Jeffrey G. & Janette P.*, 153 N.H. at 203; *Anderson v. Anderson*, 56 S.W.3d 5, 8 (Tenn. Ct. App. 1999); *Jordan*, 212 P.3d at 928. Because the parents in this case reached an impasse on the exercise of their respective parenting rights, the trial court properly utilized the best interests standard to resolve the dispute. The trial court's decision is not subject to strict scrutiny review merely because the case involves the fundamental parental right to make decisions for daughter's education and the parents' divergent religious convictions.

Our decision is consistent with that of many other courts. *See Morgan*, 964 So. 2d at 31 (court has authority to resolve educational dispute between divorced parents who share joint legal custody and have equal constitutional rights concerning their child by applying best interests standard "without implicating the Fourteenth Amendment due-process rights of either parent"); *Jordan*, 212 P.3d at 927-28 (father's religious objection cannot be the basis of precluding superior court from determining what educational placement is in the child's best interest); *Yordy v. Osterman*, 149 P.3d 874, 876 (Kan. Ct. App. 2007) (trial court has authority to decide between secular and religious schools, based on best interest of child, where parents with joint legal custody cannot agree); *Andros v. Andros*, 396 N.W.2d 917, 924 (Minn. Ct. App. 1986) (declining to apply "compelling state interest" standard to review court decree that modified visitation because decree neither affected father's religious beliefs nor his right to practice his religion); *Hoedebeck v. Hoedebeck*, 948 P.2d 1240, 1242 (Okla. Ct. App. 1997) ("This religious argument is neither new nor rare. Any time divorced parents have different religious faiths, [argument that court's decision was religiously motivated] may be made by the losing party. The fact that one parent is awarded custody of the children does not, in itself, violate the other parent's religious rights.").

## IV

Although mother did not raise the issue before the trial court, she now argues that "the trial court committed plain error by ordering a change in [daughter's] educational setting based *exclusively* on the unqualified opinion testimony of the [GAL], who admitted she is not a brain expert . . . ,

yet testified regarding adolescent brain development and [daughter's] *future* educational needs." Mother contends that "the court clearly relied on the GAL's opinion as if she were an expert."

■ The plain error rule allows us to correct errors not raised in the trial court under certain limited circumstances. *See* SUP. CT. R. 16-A; *Laramie v. Stone*, 160 N.H. 419, 432 (2010). Before we may do so: (1) there must be error; (2) the error must be plain; (3) the error must affect substantial rights; and (4) the error must seriously affect the fairness, integrity or public reputation of judicial proceedings. *Laramie*, 160 N.H. at 432. Generally, to satisfy the burden of demonstrating that an error affected substantial rights under the third prong, the party seeking appellate review must demonstrate that the error was prejudicial; that is, that it affected the outcome of the proceeding. *Id.* We use this rule sparingly, limiting it to those circumstances in which a miscarriage of justice would otherwise result. *Id.*

The GAL testified that she had researched the subject of adolescent brain development and attended some seminars, learning that the human brain undergoes tremendous changes during adolescence. She stated that "the literature" explains that "the repeated stimulation of brain connections causes areas of the brain to become strengthened, while not using areas of the brain causes them to wither away . . . [and] [t]hat, to me, implicates how a child should be spending their [*sic*] time. . . . [I]t raises the question about whether or not a child should be engaged in activities which promote active brain development and active brain skill development." She also testified that she was "not an expert in brain science."

While her research contributed to the GAL's opinion that public school is the proper school placement for daughter, she also testified to other reasons for her recommendation. These included the strong alignment of daughter's beliefs with her mother's, daughter's limited opportunity in her home school experience to face situations that will be socially challenging to her, her hindered ability to consider and discuss disparate points of view with others who do not share her position, and her tenuous relationship with her father.

■ After reviewing the record and the order, we doubt that the trial court committed any error in the manner mother contends. In any event, we are certain that plain error affecting mother's substantial rights did not occur for at least three reasons. First, the GAL expressly stated that she is not an expert in brain science. Nothing in the record or in the order suggests that the trial court *sua sponte* considered the GAL's statements on adolescent brain development as those of a qualified expert in the face of the GAL herself expressly denying such status. Second, the trial court's

decision was not based exclusively upon the GAL's testimony and, further, the foundation for the GAL's recommendation was based upon more than her adolescent brain development research.

Finally, it is clear on this record that the trial court was fully aware of the issue of independent research informing the lay opinion testimony. Mother herself repeatedly testified to research and studies that she had reviewed which had convinced her that home schooling was superior to public schooling. Father objected and moved to strike all of her testimony regarding studies and research on the basis that mother was not a qualified expert and had no personal knowledge about the research. The trial court denied the request, allowing her to express her opinion and ruling that "[t]he testimony about the research goes to the weight of the opinion, rather than to the admissibility of the opinion." Given all these circumstances, we conclude that mother has not established that the trial court committed plain error that affected the outcome of the proceeding.

V

Mother's remaining arguments involve allegations of error regarding the trial court's specific reasoning, findings and rulings. Accordingly, we set forth the essential features of the trial court's decision in order to give context to her arguments.

The trial court related some of the history between the parties with respect to daughter's schooling, and the general nature of the testimony and evidence before it, including the GAL's report and testimony, and the testimony of father and mother. It found that daughter's home school experience consisted of performing school work at home, taking private music lessons, and attending a monthly theater class and weekly classes in art, Spanish and physical education at a public school in Meredith. With respect to the school work daughter performed at home, the trial court found that the curriculum included "math, reading, English, social studies, science, handwriting and spelling, Spanish and bible class." It found that this curriculum, approved by the school district, was "comparable to the public school curriculum at the same age, except for the bible class." Regarding daughter's home school process, the trial court found that daughter completes "her work on a computer at her mother's residence, and her mother assists her by preparing the classes and being familiar with the content and being available while she does the work."

The trial court found that "[daughter] is generally likeable and well liked, social and interactive with her peers, academically promising, and intellectually at or superior to grade level." It also determined that daughter "is doing very well academically and scores above-average in most classes when compared with the national average for children of her class and age

group," that she fulfills the public school requirements for theatre and music, and that she engages in many social activities that are not related to her church or faith. Noting that the relative academic merits of daughter's home schooling as compared to public schooling were not disputed by the parties, the trial court stated that "the debate centers on whether enrollment in public school will provide [daughter] with an increased opportunity for group learning, group interaction, social problem solving, and exposure to a variety of points of view." It identified the guideposts it utilized to resolve the parents' dispute:

> the Court is guided by the premise that education is by its nature an exploration and examination of new things, and by the premise that a child requires academic, social, cultural, and physical interaction with a variety of experiences, people, concepts, and surroundings in order to grow to an adult who can make intelligent decisions about how to achieve a productive and satisfying life.

The trial court remarked that it considered the impact that daughter's religious convictions had on her "interaction with others, both past and future." Ultimately, by a standard of preponderance of the evidence, the trial court concluded that "it would be in [daughter's] best interests to attend public school."

The trial court declined "to impose any restrictions on either party's ability to provide [daughter] with religious training or to share with [daughter] their own religious beliefs." Also, in its order denying mother's motion for reconsideration, it emphasized that the parties had the "authority to agree to continue the hybrid approach they have been using (home school plus some public school classes), and authority to agree that [daughter] attend a Christian school or other school with a religious educational program," and that "if they were to agree to either alternative, [it] would ratify their agreement."

Mother contends the trial court was improperly influenced by the testimony of the GAL, who was allegedly biased against religion. To illustrate the GAL's alleged bias, mother points to statements that the GAL made during her testimony, a GAL report identifying religious issues and father's views, and the GAL's decisions not to interview mother's Christian personal references and not to review Christian-based home school research that she provided.

With respect to the GAL's testimony, mother isolates the following statements: "My recommendations have been somewhat swayed by the way she — the way her religion causes [daughter] to shut out points of view and areas of consideration, and shut out the thinking about points of view"; and

daughter is "very adultified and highly identified with her mom's views and her mom's — the rigidity of her mom's religious beliefs and how that orders her thinking really causes me to believe that [daughter] would be best served by starting public school as soon as possible." Viewing these statements in light of the GAL's entire testimony, we conclude that the GAL was expressing her concern about daughter's ability to mentally process, as well as appropriately communicate with others who have, differing viewpoints. The GAL did not disparage the fact that daughter and mother have a certain religious faith or the tenets of that faith. We render the same conclusion regarding the content of the GAL report.

With respect to the GAL's investigative decisions, mother testified to her recollection of the GAL's statements and conduct, and the GAL disputed mother's testimony. For example, mother testified that the GAL decided not to interview several of her personal references solely because they either attended mother's church or shared her faith. She also testified that the GAL refused to review the home school literature she provided and "said it's all Christian-based. I don't want to hear it." Mother averred that she believed that the GAL was "basing her opinion on concerns of [mother's] faith."

In contrast, the GAL testified that she had reviewed some home school material mother had provided, and interviewed some of the people whom mother had requested, such as daughter's gymnastics instructor and piano teacher. She denied harboring any bias against daughter's or mother's religious beliefs. Indeed, regarding her investigative decisions, the GAL stated that she had sought to "keep separate the issues of church and state" and focus only on the "best interest of this child, and it's not necessarily about religion." The GAL also denied other allegations attributed to her by mother, or otherwise explained her conduct and statements in a manner that indicated the absence of religious bias.

■ In its order, the trial court found "the [GAL's] recollection and testimony reliable, and . . . considered this finding in analyzing the reliability of the rest of [mother's] testimony." In its order denying mother's motion for reconsideration, the trial court rejected mother's claim of GAL bias, reiterating that it had credited the GAL's recollection as to her statements made and behaviors exhibited during the investigation. Resolving conflicts in the testimony and questions about the credibility of witnesses, and determining the weight to be given testimony, are within the trial court's discretion. *In the Matter of Choy & Choy*, 154 N.H. at 713. Mother has not persuaded us that the trial court unsustainably exercised its discretion in that regard.

Mother also contends that the trial court's decision impermissibly preferred father's viewpoint on the need for tolerance and diversity over her and daughter's religious convictions, implied that "it was improper for [mother] to encourage [daughter] to adopt her religious beliefs," and suggested that daughter needed to be exposed "to other religious views contrary to the faith of her parents." She argues that the trial court "was wrong to opine that [daughter] may be too 'rigid' on 'questions of faith[,]' and too 'vigorous [in] defense of her religious beliefs.' "

When applying the best interests standard to decide a parenting rights and responsibilities matter, the trial court may consider a parent's religious training of his or her child solely in relation to the welfare of the child. *See Sanborn v. Sanborn*, 123 N.H. 740, 748-49 (1983); *see also Jordan*, 212 P.3d at 928 (father's religious objection cannot be the basis of precluding the superior court from determining what educational placement is in the child's best interests). The trial court can restrict a parent's religious training of his or her child only if substantial evidence shows that the child's welfare was in fact jeopardized by that religious training. *See Chandler v. Bishop*, 142 N.H. 404, 413-15 (1997); *Sanborn*, 123 N.H. at 749; *see also Hoedebeck*, 948 P.2d at 1242 ("the court may not decide that one religion is better or worse than another, but it does have the duty to determine the best interests of the children"). We review the trial court's order in light of the record to determine whether it decided daughter's best interests regarding her school placement on impermissible religious grounds in the manner alleged by mother. *See Sanborn*, 123 N.H. at 748 (reviewing court's decree in light of the record).

There is no doubt that mother's and child's religious convictions have been a pervasive part of the parties' school placement dispute. Mother's decision to home school was, at least in part, motivated by her religious convictions. Father's decision to place daughter in public school arose, at least in part, from his concern that her home school experience did not allow her adequate exposure to differing viewpoints, including people who do not share her religious faith. In its order, the trial court referred to the evidence presented that involved mother's and daughter's religious beliefs, including: the GAL's account of daughter's interaction with her counselor in which daughter "appeared to reflect her mother's rigidity on questions of faith"; the GAL's concerns about the impact of daughter's religious beliefs on her relationship with her father; the father's desire to expose daughter to different viewpoints to decrease his daughter's "rigid adherence" to her mother's religious beliefs; and mother's acknowledgement of the strength of her and daughter's religious beliefs. The trial court also remarked that daughter's strong adherence to religious convictions that align with her

mother's beliefs likely was the effect of "spend[ing] her school time with her mother and the vast majority of all of her other time with her mother."

Although some of the evidence recited by the trial court had a religious context, the trial court remarked that when ruling on the school placement dispute, it had "not considered the merits of [daughter's] religious beliefs, but considered only the impact of those beliefs on her interaction with others, both past and future." When denying mother's motion for reconsideration, the trial court further set forth the context in which it considered the evidence involving mother's and daughter's religion: "Evidence of some of the specific tenets of [mother's] faith [was] only admitted because of statements and behaviors of [daughter] suggesting that [daughter's] application of the logical consequences of those tenets was impacting her feelings toward her father and might impact her development in other areas"; and "The evidence about faith is only relevant because [daughter] was unhappy that her father does not love her enough to want to spend eternity with her by adopting her faith. The specific tenets of [mother's] faith are not the subject of the Court's inquiry." The record supports these statements.

Specifically, evidence was presented that daughter exhibited difficulty interacting with others, particularly her father, when they did not agree with her religious convictions. For example, the GAL testified to a situation in which daughter became angry with her therapist when the therapist did not read certain religious materials provided by daughter and "closed down in the [therapy] session." Father testified regarding some conversations he tried to have with daughter about her religious beliefs, and explained "if somebody doesn't believe in [daughter's] religion, if somebody does something differently from what she has been told by her mom is either right or wrong, based on this religion, she has a real, real hard time with it." He also testified, "if there's ever anything that goes against what she believes in, she doesn't really know how to respond and she automatically thinks that somebody's attacking her or somebody is going up against her," and, "when you have a serious discussion with [daughter] . . . when you question her beliefs, or you present another idea to her about a religious belief, she doesn't know what to do. She clams up. She turns away. You know, she just really can't go any further."

▌ In its order, the trial court did not express a belief that daughter needed to be exposed to other religions that were contrary to or different from the beliefs of her parents. Instead, it considered the importance of daughter having the ability to openly communicate with others who have a different viewpoint on a subject matter, whether or not the topic is religious in nature. It also considered the benefits of group learning, group interac-

tion, social problem solving and exposure to a variety of points of view. We reject mother's contention that the trial court expressed disapproval of her actions in encouraging daughter to share her religious views. Rather, the trial court found that daughter's firm religious convictions likely stemmed from the amount of time she spends with her mother, considering that daughter primarily resided with, and had been primarily educated by, her mother. *See Hoedebeck*, 948 P.2d at 1242 ("To fail to consider the impact of certain actions the parents take, simply because the actions are labeled religious would be to exempt such acts from consideration, no matter the impact on the children.").

The trial court did not express disfavor regarding the religious nature of daughter's beliefs or disapproval regarding her vigorous defense of her religious beliefs. Nor did the court criticize the merits of mother's and daughter's religious convictions. *See Chandler*, 142 N.H. at 410 (marital master's religious references related to manner in which father chose to impart religious beliefs to child, not to expression or content of religious beliefs); *compare Sanborn*, 123 N.H. at 748-49 (court decree advanced preference for father's religion because it made provision for his religious holidays but not for mother's). Indeed, as the trial court emphasized, its order did not impose any restrictions on either parent's ability to provide daughter with religious training or to share with daughter his or her own religious beliefs. Accordingly, we conclude that the trial court properly considered daughter's religious beliefs only in the context of her welfare when resolving the school placement dispute between the parents. *See Von Tersch v. Von Tersch*, 455 N.W.2d 130, 135 (Neb. 1990) (because language of order indicates that court compelled attendance in public school for secular reasons only, court order did not give rise to First Amendment, freedom of religion issue); *Yordy*, 149 P.3d at 876 (when resolving parenting dispute on child's school placement by disregarding conflicting religious preferences and focusing upon other important factors, court order did not offend First Amendment Establishment Clause).

Mother next argues that the trial court erroneously applied the best interests standard by basing its decision upon an unsupported definition of the purpose of education. In its order, in identifying the parameters it utilized to resolve the parents' school placement dispute, the trial court stated that "education is by its nature an exploration and examination of new things," and that "a child requires academic, social, cultural, and physical interaction with a variety of experiences, people, concepts, and surroundings in order to grow to an adult who can make intelligent decisions about how to achieve a productive and satisfying life." In denying mother's motion for reconsideration, the trial court explained that it

"intended to illuminate the difference between the experience of home schooling and the experience of public schooling, based on the evidence, rather than to suggest or apply a different educational standard." Nevertheless, mother contends that the trial court, *sua sponte*, invented its own definition of the purpose of education without citing any legal authority, and that the definition is at odds with the purpose of public school education under RSA 193-E:2 (2008) and fails to account for the educational requirements for home school education under RSA 193-A:4, I (2008).

Without deciding whether the trial court was bound to resolve the school placement dispute in accordance with RSA chapter 193-E (2008 & Supp. 2010) and RSA chapter 193-A (2008 & Supp. 2010), we conclude that its references to the nature of education and foundational skills necessary for a child to become a productive and satisfied adult were not inconsistent with RSA 193-E:2 or RSA 193-A:4, I. RSA 193-E:2 sets forth the criteria for an adequate education provided through the public school system, including "[s]kills for lifelong learning . . . to enable them to learn, work, and participate effectively in a changing society." RSA 193-E:2, VII. Also, the legislature declared that public elementary and secondary education shall provide "all students with the opportunity to acquire the knowledge and skills necessary to prepare them for successful participation in the social, economic, scientific, technological, and political systems of a free government, now and in the years to come." RSA 193-E:1, I. The parameters the trial court enumerated to guide its decision do not in any way contravene RSA 193-E:2.

Turning to RSA 193-A:4, I, the statute defines home education to consist of certain academic areas, such as science, mathematics, reading and writing. As the trial court noted, however, the dispute between the parties in this case did not revolve around the relative academic merits of public and home schooling. Their dispute centered upon which academic experience would be in daughter's best interests. We fail to see how the parameters set forth by the trial court to resolve the matter did not account for the definition of home education under RSA 193-A:4, I.

The factors the trial court considered to guide its school placement decision in light of daughter's best interests are consistent with RSA 461-A:6, I. *See* RSA 461-A:4. The court's order refers to such factors as group learning, social problem solving, exploration and examination of new things, and academic, social, cultural and physical interaction with a variety of experiences, people, concepts and surroundings, as well as securing foundational skills necessary to become a productive and satisfied adult. These criteria are in accord with the factors set forth in RSA 461-A:6, I, including "[t]he relationship of the child with each parent," "[t]he child's

developmental needs," and "[t]he quality of the child's adjustment to the child's school and community and the potential effect of any change," as well as "[a]ny other additional factors the court deems relevant." RSA 461-A:6, I(a), (c), (d), (l). We conclude that mother has failed to demonstrate that the parameters used by the trial court to guide its decision constituted legal error or an unsustainable exercise of discretion.

■ Finally, mother contends that the trial court erred because it presumed that public school is "automatically in a child's best interests" and demonstrated a "per se" bias for public school over home school. Her argument is based, in part, upon her allegation that the trial court's decision compelling daughter to attend public school was inconsistent with its factual findings and with the evidence regarding her home school experience. She points to the trial court's findings that she was in complete compliance with home schooling laws, and its acknowledgement that daughter academically excelled in the home school environment and was well-socialized. She also contends that the evidence established that daughter could communicate and think effectively and critically, solve problems, and acquire skills for lifelong learning in the home school environment. We conclude, however, that neither its order nor the record reveals that the trial court exhibited a presumptive bias in favor of public schooling, and that the record establishes an objective basis sufficient to sustain its discretionary judgment.

With respect to her home school experience, there was evidence that daughter learned many of her academic subjects, such as math, reading, English and social studies, primarily by watching recorded lessons by herself on a computer at home, completing worksheets or workbooks and asking her mother questions as needed. Evidence established that there was no interactive quality between daughter and the person providing instruction in the recorded lesson. Testimony illustrated that her mother reviewed her work, engaged in some discussion with daughter, and replayed a recorded lesson as necessary. This process encompassed approximately three to three and one-half hours per day, and there was evidence that daughter was "bored" with, and "lonely" in, this educational environment. Regarding her public school classes, there was evidence that daughter actively participated and adapted well.

Regarding the impact of daughter's religious beliefs on her interaction with others, testimony showed that she would "shut down" and "clam[] up" when a person challenged or disagreed with her convictions. The GAL testified to a situation in which daughter became angry with her therapist when the therapist did not read certain religious materials provided by daughter and "closed down in the [therapy] session." The GAL testified

that daughter's relationship with her father was somewhat tenuous as a result of their different religious beliefs. Father testified to several instances in which daughter exhibited difficulty discussing different points of view with him on issues involving her religious convictions.

The GAL testified that a public school environment would offer daughter opportunities to navigate experiences in both social and academic situations with others who have differing viewpoints, and learn to openly discuss differences without wanting to "shut down" or "close[] down." The trial court noted the GAL's conclusion that

> [daughter's] interests, and particularly her intellectual and emotional development, would be best served by exposure to a public school setting in which she would be challenged to solve problems presented by a group learning situation and by the social interactivity of children of her age.

It is not our role to calculate how much weight the trial court should afford specific evidence, second guess its decision on matters of witness credibility, or substitute our judgment for that of the trial court on a discretionary ruling. *See In the Matter of Hampers & Hampers*, 154 N.H. at 281; *In the Matter of Choy & Choy*, 154 N.H. at 713. Rather, we review only "whether the record establishes an objective basis sufficient to sustain the discretionary judgment made," and we will not disturb the trial court's determination if it could reasonably have been made. *See In the Matter of Choy & Choy*, 154 N.H. at 713 (quotations omitted). The evidence concerning daughter's experiences in her home school and public school settings, along with the evidence demonstrating the impact of her religious convictions upon her interaction with others, including her father, provide an objective basis for the trial court's decision and we cannot say that it is unreasonable.

The trial court's acknowledgement that daughter successfully participated in several activities outside of her home, performed well academically with home education, and is "generally likeable and well liked, social and interactive with her peers" does not render its decision that attending public school was in daughter's best interests an unsustainable exercise of discretion. Nor are we persuaded that evidence demonstrating daughter's abilities to, for example, communicate and think effectively and critically, establishes that the trial court unsustainably exercised its discretion. We emphasize that the trial court did not need to decide that home schooling was somehow deficient or detrimental to daughter in order to determine that her placement in public school was consonant with her best interests. Nor does the fact that the trial court reasonably could have reached a different decision based upon the evidence before it mean that its decision

constitutes an unsustainable exercise of discretion. *Cf. Appeal of Osram Sylvania*, 142 N.H. 612, 617 (1998) ("Whether or not we would have reached a different conclusion, based upon the weight of the evidence, is of no consequence since we will not substitute our judgment for that of the [lower tribunal]" on a matter of judicial discretion); *Cumberland Farms v. Pierce*, 104 N.H. 489, 497 (1963) ("The problem therefore is not whether this court or some other tribunal would have reached a different conclusion from that reached by the [tribunal whose decision is on review], but whether, taking the evidence as a whole, the [tribunal] could reasonably have found as it did" on a matter of judicial discretion).

We conclude that the evidence provides an objective basis sufficient to sustain the trial court's discretionary judgment that it was in daughter's best interests to attend public school for the 2009-2010 school year. Accordingly, mother has failed to demonstrate that the trial court's decision constitutes an unsustainable exercise of discretion. *See In the Matter of Choy & Choy*, 154 N.H. at 713.

Mother's remaining arguments either do not warrant judicial review because they lack developed legal argument, *Douglas v. Douglas*, 143 N.H. 419, 429 (1999), or are without merit and do not warrant further discussion, *Vogel v. Vogel*, 137 N.H. 321, 322 (1993).

*Affirmed.*

DALIANIS, C.J., and DUGGAN, HICKS and CONBOY, JJ., concurred.